## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ALMIRA JACKSON,

        *Plaintiff*,

CASE NO. 14-13888

DISTRICT JUDGE GERALD R. ROSEN

*v.*

MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

        *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 17)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Jackson is not disabled. Accordingly, **IT IS RECOMMENDED** that Jackson's Motion for Summary Judgment[1] (Doc. 14) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 17) be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 et seq., and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381 et seq.

---

[1] Jackson's motion is titled "Motion for Remand Pursuant to Sentence Four," but can be accurately characterized as a motion for summary judgment, and will be treated as such in this decision. *See Bubel v. Commissioners of Soc. Sec.*, No. 12-10616, 2013 WL 5231217, at *1 (E.D. Mich. Sept. 17, 2013).

Title II. (Doc. 3; Tr. 91-98). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 17).

Plaintiff Almira Jackson was forty-eight years old when she applied for benefits on December 12, 2011, alleging that she became disabled on May 15, 2011; Jackson's alleged onset date was later amended to November 8, 2011 (Tr. 34, 137, 144). This application was denied on April 4, 2012. (Tr. 91-98). Jackson requested a hearing before an Administrative Law Judge ("ALJ"), which took place on May 20, 2013, before ALJ Anthony R. Smereka. (Tr. 28-56). Jackson, who was represented by attorney Clifford Walkon[2], testified, as did vocational expert ("VE") Helen Topcik. (Tr. 28). On June 7, 2013, the ALJ issued a written decision in which he found Jackson not disabled. (Tr. 8-23). On August 18, 2014, the Appeals Council denied review. (Tr. 1-5). Jackson filed for judicial review of the final decision on October 8, 2014. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

---

[2] On appeal, Jackson is represented by attorney Lewis M. Seward. (Doc. 14)

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.   Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least

3

twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.   ALJ Findings

Following the five-step sequential analysis, the ALJ found Jackson not disabled under the Act. The ALJ found at Step One that Jackson had not engaged in substantial gainful activity since November 8, 2011, the alleged onset date. (Tr. 13). At Step Two, the ALJ concluded Plaintiff had the following severe impairments: "rheumatoid arthritis, depression,

4

obesity, and chronic obstructive pulmonary disease." (*Id*.). At Step Three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 14-16). The ALJ then found that Jackson had the residual functional capacity ("RFC") to perform light work, except that Jackson

> cannot be exposed to hazards, including no work at unprotected heights or around dangerous moving machinery, and no climbing ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; can never crawl; cannot perform work with her upper extremities above shoulder level; cannot have concentrated exposure to dust, fumes, odors, humidity or wetness, temperature extremes, or vibration; and can never perform constant handling or fingering, but can do so frequently. The claimant needs a sit/stand option allowing her to perform work either sitting or standing, and allowing for a change of position every 30 minutes. In addition, she is limited to unskilled work, cannot work with the general public, and cannot perform fast production pace work where the pace is set by others.

(Tr. 16). At Step Four, the ALJ found that Jackson was unable to perform her past relevant work as a cleaner. (Tr. 21). At Step Five, the ALJ found that a significant number of jobs existed that Jackson could perform despite her limitations. (Tr. 21-22). As a result, the ALJ found Jackson not disabled under the Act. (Tr. 23).

### E.   Administrative Record

#### 1.   Medical Evidence

On May 7, 2003, Jackson first treated with Dr. Linda Balogh, who recorded Jackson's complaints of breast pain and left upper quadrant discomfort. (Tr. 247-48). Dr. Balogh found Jackson's physical condition to be generally normal. (*Id*.).

On June 19, 2003, Dr. Balogh noted bilateral knee pain due to "some overuse injury." (Tr. 281). Dr. Balogh also asserted that she was "sure [films of Jackson's weight-bearing knee] will show minimal osteoarthritis." (Tr. 282).

On December 8, 2003, Jackson told Dr. Krista Hodne that she was experiencing chest pain, which was found to be reproducible with palpation of the right chest. (Tr. 278). Jackson also complained of pain in her back, knees, and elbows. (Tr. 279).

On June 9, 2005, Dr. Sharon Berkowitz diagnosed Jackson with depression, abdominal pain, and ovarian pain. (Tr. 275-77).

On October 24, 2005, Jackson told Dr. Balogh that she was recently separated from her husband, and that she was experiencing emotional stress and physical manifestations thereof as a result of disputes with her husband; she was started on Citalopram and Klonopin to treat anxiety and depression. (Tr. 273).

On January 18, 2006 Jackson complained to Dr. Balogh of right hand pain caused by a fall on ice approximately two months prior. (Tr. 271). Jackson experienced consistent pain without swelling, and had a normal range of motion in that hand; Dr. Balogh recommended that Jackson visit a hand surgeon, though it does not appear that she followed this advice. (*Id.*). She also expressed problems with depression brought on by relationship troubles with her husband. (*Id.*).

On February 20**,** 2006, Jackson complained to Dr. Balogh of chronic bilateral knee pain and emotional problems caused by fights with her husband. (Tr. 269). Dr. Balogh found that Jackson looked anxious and displayed evidence of hypertension. (*Id.*). On March 3, 2006, Dr.

6

Balogh found that Jackson's blood pressure was elevated, and she prescribed hydrochlorothiazide to treat hypertension. (Tr. 267).

On April 6, 2006, Dr. Greta Branford found that Jackson suffered from "severe and worrisome chest pain that seems to be completely resolved at present." (Tr. 264).

On September 29, 2006, Jackson treated with Dr. Annissa Jabarin-Hammoud. (Tr. 258-59). Jackson complained of poor sleep, agitation, and depression resulting from her father's death. (Tr. 258). Dr. Jabarin-Hammoud noted Jackson's hypertension and increased depression due to the "situational trigger" of her father's death. (*Id*.).

On January 19, 2007, Jackson treated with Dr. Branford, and complained of sharp chest pains; Dr. Branford found that Jackson suffered from depression, but was "doing fairly well" with the anti-depressant Celexa, and also suffered from insomnia and hypertension. (Tr. 256).

On April 24, 2007, Jackson again treated with Dr. Branford, who recorded Jackson's complaints of a urinary tract infection and arm pain; Dr. Branford diagnosed Jackson with a urinary infection and tennis elbow. (Tr. 252).

Jackson again treated with Dr. Balogh on November 17, 2007, wherein she complained of "increasing [leg and foot] pain over the past several years, [which had] gotten much worse lately as she does a standing job." (Tr. 250). She reported taking Celexa, in addition to blood pressure medication; she further asserted that her depression was waning and she wished to "wean her Celexa down." (*Id*). Dr. Balogh found evidence of a heel spur, plantar fasciitis (heel pain), hypertension, and depression. (Tr. 250-51).

On March 19, 2012, Jackson underwent a physical consultative examination with Dr. Leonidas Rojas. (Tr. 386-91). Jackson complained of pain without swelling in her knees, feet,

and wrists, which was aggravated by standing or walking. (Tr. 386). Jackson said she had been told that x-rays of her knees showed no abnormalities, and that a round of physical therapy did not resolve her symptoms. (*Id.*). Jackson further attested to depression resulting from "difficulties in her marriage." (*Id.*). Dr. Rojas found Jackson's physical condition generally normal: he found normal gait, no sensorimotor abnormalities, equal and active tendon reflexes, and an intact ability to perform fine and gross manipulations. (Tr. 387). However, Jackson's grip strength was somewhat reduced at 9kg on the right hand and 6kg on the left, she had minor difficulty squatting, getting on the examining table, and climbing stairs, and minimal tenderness in most joints. (Tr. 387-390). He diagnosed "non-specific" joint pain, controlled hypertension, and a history of depression and anxiety. (*Id.*). Dr. Rojas recorded generally normal flexibility, with only some minor reduction of flexibility in Jackson's lumbar spine and knee. (Tr. 389).

Also on March 19, 2012, Jackson underwent a psychological consultative examination with Dr. Himaja Gummadi at HCC Evaluations. (Tr. 393-95). Jackson complained of significant pain in her neck, elbows, wrists, knees, and ankles, depression since 2001, marital problems, and crying spells with feelings of hopelessness but without suicidal ideations or delusions. (Tr. 393). Jackson also reported living by herself, visiting with friends, and cooking for herself. (Tr. 394). Dr. Gummadi noted no tendency to exaggerate, alertness to time, person, and place, low self-esteem, normal thought processes, and pleasant affect. (*Id.*). Sensorium and mental capacity tests showed entirely normal results. (Tr. 394). Dr. Gummadi found that Jackson would be able to "understand, retain, and follow simple instructions," but would be "restricted to performing simple, routine, and repetitive tasks," and that she would be

"restricted to work that involves brief superficial interactions with coworkers, supervisors, and the public." (Tr. 395). She assigned a Global Assessment of Functioning ("GAF") score of 55.[3] (*Id.*).

On June 8, 2012, Dr. Jehan Barbat interpreted an MRI of Jackson's knees, which showed generally unremarkable results. (Tr. 412). On June 20, 2012, Jackson underwent an MRI examination of her right hand as interpreted by Dr. Samir Ashraf. (Tr. 410-11). That scan revealed "mild degenerative changes of the first, second, third, and fourth metacarpophangeal joints," with "no evidence of erosions, fracture, or osteonecrosis," and no apparent damage to the soft tissue, flexor tendons, extensor tendons, carpal tunnel, or Guyon's canal. (Tr. 410).

From August 2011 to September 2012, Jackson treated with personnel at United Rehab & Medical Center. (Tr. 415-483). Based on the signatures on the notes produced in these sessions, Jackson appears to have sought treatment from several persons at that facility. Much of the handwriting, including signatures, is illegible due to poor penmanship and scanning quality. However, it can be discerned that Jackson was seen by Physician's Assistant Cheryl Boyd (*see, e.g.*, Tr. 436, 444), by "Dr. Paris" (Tr. 464), and by two additional authors whose signatures are fully incomprehensible (*see, e.g.*, Tr. 462, 472). Despite the illegibility of the handwriting, the authors also circled their findings on a standardized form. These findings are generally consistent, and almost all include notes that Jackson suffered from weight issues, wheezing, shortness of breath, stiffness, myalgia, joint pain, wrist pain, chest pain, and anemia.

---

[3] A GAF score of fifty-one to sixty indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 2000). **Error! Main Document Only.**The most recent edition of this text, however, rejects the use of GAF scores. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed., 2013).

(Tr. 415-483). On September 7, 2011, Dr. Paris diagnosed Jackson with rheumatoid arthritis; this finding was supported by a September 1, 2011, blood test which showed an abnormally high rheumatoid factor. (Tr. 479, 496). On June 5, 2012, Jackson visited United Rehab & Medical Center and received what appears to be a doctor's note, signed by a physician who is unknown due to the indecipherability of the handwriting, but which appears on paper bearing the letterhead of Dr. Alan Silber; in that note the author records that "till further evaluation" Jackson was not to work, lift any weight over five pounds, stand more than five minutes, sit more than ten minutes, push, pull, bend, squat, or lift. (Tr. 533).

In July 2012 physician's assistant Cheryl Boyd completed a "medical questionnaire" purporting to reflect Jackson's level of disability. (Tr. 397-402). In that questionnaire, Boyd asserted that Jackson suffered from "severe low back pain" that prevented her from carrying more than five pounds occasionally, walking more than five minutes, standing more than five minutes, sitting more than five minutes, twisting, bending, squatting, or climbing. (Tr. 397). Boyd also asserted that Jackson was unable to perform a full-time job because her shortness of breath and back pain. (Tr. 398). Boyd claimed that Jackson must elevate her legs for three to four hours daily at ninety degrees, must take thirty-minute breaks every five to ten minutes, and must rest for six to seven hours in an eight-hour day. (Tr. 401). Boyd concluded that Jackson's pain would "constantly" interfere with her ability to sustain the attention and concentration necessary to perform even simple tasks. (Tr. 402). Finally, Boyd asserted that Jackson would miss at least four days of work per month. (Tr. 401).

On October 25, 2011, Jackson underwent a lung function test which showed "mild restriction." (Tr. 503). On September 11, 2012, Jackson underwent a second lung function test

10

that showed "severe restriction" in her lung function. (Tr. 499). On October 22, 2012, Jackson underwent a third lung function test which showed normal results. (Tr. 497). However, it is unclear which physician interpreted these test results, as the signature line on each is cut off or otherwise unsigned. (Tr. 497, 499, 503).

On April 17, 2012, Dr. Sugayan found that an x-ray of Jackson's knee showed "no fracture, dislocation or arthritic change." (Tr. 507). Dr. Sugayan also interpreted several x-rays of Jackson's chest: he found that a March 20, 2012, x-ray showed "slight left ventricular enlargement" and clear lungs (Tr. 508); a September 11, 2012, x-ray showed clear lungs but an enlarged left ventricle (Tr. 506); an October 22, 2012, x-ray showed that her heart was of normal size and her lungs were clear. (Tr. 505).

The remainder of Jackson's medical records originate from the Oakwood Healthcare Center-Canton emergency room. On March 5, 2011, Jackson was admitted to that emergency room complaining of a cough, congestion, and ear pain for approximately three days. (Tr. 593-97). An x-ray of Jackson's chest was found to be unremarkable. (Tr. 342, 599). Dr. David Weaver diagnosed Jackson with bronchitis, and she was prescribed an oral antibiotic and cough syrup. (Tr. 596).

On March 13, 2011, Jackson was admitted to the Oakwood Healthcare Center-Canton emergency room complaining that her ear was plugged without pain. (Tr. 583). She was diagnosed with an ear infection and prescribed with an antibiotic. (Tr. 588-89).

On April 18, 2011, Jackson was again admitted to the Oakwood Healthcare Center-Canton emergency room complaining of reproducible chest pain which became worse with movement, and which she rated at ten out of ten in severity. (Tr. 575-82). Jackson noted that

11

the pain began while moving a chair. (Tr. 580). An x-ray of Jackson's chest showed no abnormalities. (Tr. 582). Dr. John Jansen diagnosed her with costochondritis, also known as swelling of the rib cartilage, and prescribed acetaminophen codeine tablets. (Tr. 322, 581).

On May 6, 2011, Jackson was admitted to the Oakwood Healthcare Center-Canton emergency room for burning joint pain in the left hand, elbow, and scapula, which she rated at a ten out of ten in severity. (Tr. 304-15, 560-74). Dr. Weaver interpreted radiological scans of Jackson's left wrist, which he found showed no fracture, dislocation, arthritis, or radiopaque, and of her chest, which he found showed no abnormalities. (Tr. 345, 572). Dr. Weaver's notes indicate that he both diagnosed Jackson with carpel tunnel syndrome and simultaneously made a "rule out" diagnosis of that condition. (Tr. 562). Dr. Weaver also diagnosed paresthesia of the left hand, and provided a splint and Vicodin and ibuprofen tablets. (Tr. 314, 568). Jackson was referred to an orthopedic doctor and discharged. (Tr. 565).

On October 24, 2012, Jackson was admitted to the Oakwood Healthcare Center-Canton emergency room complaining that she was "unable to eat" and that she was depressed. (Tr. 552-57). Her attending physician, apparently Dr. Chada Reddy, rendered a clinical impression of anxiety disorder. (Tr. 554).

On December 9, 2012, Jackson was again admitted to the Oakwood Healthcare Center-Canton emergency room following several days of diarrhea, chills, and headache. (Tr. 543-49). On examination, Dr. Weaver found Jackson's physical condition to be nominal with the exception of dry oral mucosa. (Tr. 547-48). She was diagnosed with diarrhea and discharged the same day. (Tr. 549).

### 2.    Application Reports and Administrative Hearing

### a.      Jackson's Function Report

Jackson completed a function report on January 7, 2012. (Tr. 193-200). In that report, she asserted that she suffers "constant pain all the time" in her "wrist, legs[,] and ankles." (Tr. 193). Jackson reported that her maladies limited her abilities to stand, walk, bend, lift, and hold objects. (*Id.*). Jackson asserted that her average day consists of showering, watching television, cooking, doing dishes, caring for her dog, and taking a ten-minute walk twice daily when she is able to do so. (Tr. 194). She stated that she is no longer able to run, walk quickly, work, ride bikes, or exercise because of pain while moving. (*Id.*). She also reported that she experiences pain when bathing, dressing, shaving, sitting on a toilet, and showering due to her leg maladies, and that she experiences hand pain when holding a hair dryer. (*Id.*). She does not require reminders to take medicine or perform personal care. (Tr. 195). With regard to meals, Jackson asserted that she prepares cereal, oatmeal, sandwiches, frozen pizza, hamburgers, and two- or three-course meals on a daily basis. (Tr. 195). She asserted that she generally spends an hour cooking daily, but must take a break from standing during that time. (*Id.*). She dusts and does laundry twice weekly, which take one hour and four hours respectively. (*Id.*). She does not perform yard work because the cold weather exacerbates her breathing problems and because such labor "hurts my legs & wrist." (Tr. 196). She reported not leaving the house alone for fear of falling, but that she is able to drive. (*Id.*). She also reported shopping for food and other items twice weekly for about an hour. (*Id.*). She reported being able to manage financial matters, but experienced some difficulty due to her declining eyesight. (*Id.*).

Regarding pastimes, she reported playing with her dog and playing cards a few times a week, and watching television daily; she noted that these activities have become more difficult

because of difficulty sitting, standing, bending, and stretching. (Tr. 197). She also stated that she participates in fewer family functions because of trouble with her eyes and legs. (Tr. 198). She reported being able to walk for ten to fifteen minutes at a time before requiring a three-minute rest, must take stairs slowly while stabilizing herself with her hands on both sides, and must stabilize herself to bend down. (*Id*.). She reported no problems paying attention, and said follows both written and verbal instructions well. (Tr. 198). She noted problems dealing with stress, but reported adroitly handling changes in routine. (Tr. 199). She wears glasses all of the time, and uses a brace when she experiences pain in her left arm. (*Id*.). She reported no side effects from her use of Vicodin or Naproxen. (Tr. 200).

Jackson's sister, Lori Ann McCauley, completed a third-party function report on January 7, 2012. (Tr. 181-88). McCauley reported that she spends two to four hours weekly with Jackson, doing activities like shopping, watching movies, eating dinner, and visiting. (Tr. 181). McCauley further asserted that Jackson's arms "get tingly when she holds anything more than 5 minutes," and that her knees ache when she stands for "long periods." (*Id*.). McCauley reported that Jackson's daily activities consist of making and eating breakfast and dinner, showering, taking care of her animal, and sleeping. (Tr. 182). She also noted that Jackson plays board games, plays computer games and card games, and watches television. (Tr. 185). McCauley confirmed that Jackson suffers pain when bending her knees, lifting her legs, holding a hairdryer or hair brush, standing for extended periods, bending to sit, and going up or down stairs. (Tr. 182). She noted that Jackson performs chores including dusting, cleaning, and laundry once or twice weekly, but does so with difficulty because it is painful to stand. (Tr. 183). McCauley also stated that Jackson spends time with her children and other family

14

members. (Tr. 185). Finally, she noted that Jackson can lift only five to seven pounds, walk only about ten minutes or one city block at a time, and experiences pain when using her knees. (Tr. 186).

### b.      Jackson's Testimony at the Administrative Hearing

At the May 20, 2013, hearing before the ALJ, Jackson testified that she is only able to stand or walk for about five minutes, and can sit for ten minutes, at which point "it starts hurting my legs, from them being bent for so long . . . [a]nd then my lower back starts hurting." (Tr. 40). Jackson testified that she performed part-time babysitting to supplement her income, but was unable to perform full-time work because "of the pain that I have in my body." (Tr. 43). Regarding the efficacy of her medications, Jackson testified that "[n]ot all of them" are helpful. (*Id*.). To relieve pain, Jackson asserted that she "use[s] pillows . . . behind my back, or underneath my knees," elevates her knees for about three hours daily, and uses ice packs on her knees and wrists. (Tr. 44). With regard to her hand pain, Jackson asserted that she has difficulty opening bottles, and lifting garbage and groceries. (Tr. 44-45). She also testified that she is able to perform fine manipulations like picking up change and buttoning or zippering, but sometimes experiences numbness in her hands and difficulty picking up small objects. (Tr. 45). With regard to the side effects of her medication, Jackson stated that she experiences nausea, sleepiness, and light headedness. (Tr. 46). She asserted that she takes medication to treat depression, which "controls [her depression] a little bit, but doesn't stop it from going overboard," particularly when she experiences stress or pain. (Tr. 47). She also asserted that she experiences chest pain, overheating, and redness three to four times weekly as a result of

15

her hypertension. (*Id*.). With regard to activities of daily living, Jackson stated that she watches television, dusts, and visits her son. (*Id*.).

### c.     The VE's Testimony at the Administrative Hearing

The VE characterized Jackson's past relevant work as a cleaner as unskilled work, performed at a medium level of exertion. (Tr. 50). The ALJ then asked the VE to imagine a worker of Jackson's age, education, and work experience in a series of hypothetical questions. First, the ALJ asked the VE to assume a claimant capable of light work, who is also limited as follows:

> No hazards—this includes no work at unprotected heights or no dangerous moving machinery, and no climbing of any ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs; no more than occasional balancing or stooping, kneeling, crouching; no crawling; no reaching above shoulder level. In terms of environmental, no concentrated exposure to dust, fumes, odors, humidity, or wetness, and no temperature extremes, be it extreme heat or cold. No work requiring constant handling or fingering, but this person has the ability for frequent handling and frequent fingering. Lastly, this person is restricted to unskilled work.

 (Tr. 50-51). The VE testified that such a worker would be able to perform work as a sorter (3500 jobs in the Detroit area) or inspector (3000 jobs). (Tr. 52). The ALJ then added the need for a sit-stand option such that the hypothetical worker could change positions every thirty minutes; the VE testified that such a restriction would not preclude the aforementioned positions. (*Id*.). The VE also testified that the inspector and sorter positions are not "fast paced production" positions and are not "assembly line" positions. (Tr. 52-53). Next, the ALJ asked the VE to limit the hypothetical worker to sedentary work, which involves lifting no more than ten pounds, standing for two hours daily and sitting for six hours daily, but maintaining all other restrictions of the prior hypotheticals. (Tr. 53). The VE testified that the inspector and

sorter positions would still be available to the hypothetical worker, though he altered the amount of positions available in the Detroit area to 2500 sorters and 3500 inspectors. (Tr. 53-54). The VE also testified that employers will generally not tolerate more than two absences per month. (Tr. 54).

Jackson's attorney then asked whether a hypothetical worker, if only able to use their upper extremities on an occasional basis, would be able to perform the sorter and inspector positions; the VE testified that such a restriction would preclude performing those positions. (*Id.*). Jackson's attorney also inquired as to whether a restriction requiring that the worker may elevate one leg for two hours per day would limit the hypothetical worker's work opportunities; the VE testified that such a limitation would preclude work as either a sorter or inspector. (Tr. 54-55).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, including "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do

17

despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d);

18

SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL

180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)    [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)  Precipitating and aggravating factors;

20

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G.    Analysis

Jackson argues that the ALJ's decision erred in four ways: 1) the ALJ included "rheumatoid arthritis" as a severe impairment at Step Two, but failed to specifically note that she suffers from "rheumatoid arthritis *of the wrists*;" 2) the ALJ did not list bilateral carpal tunnel syndrome as a severe impairment at Step Two; 3) the ALJ erroneously discounted the

findings of physician's assistant Cheryl Boyd and thus rendered an inaccurate RFC assessment; 4) the ALJ erroneously rejected the work note generated by an unknown person at United Rehab and Medical Center, allegedly Dr. Sibler, by reason of finding the signature indecipherable, and by erroneously concluding that the limitations set forth in that document were not supported by other evidence of record. For the reasons stated below, the Court finds that Jackson's arguments are without merit.

### 1.   The ALJ Did Not Err by Failing to Specifically Note That Jackson's Rheumatoid Arthritis Affects Her Wrists

Jackson first argues that the ALJ erred by finding that she suffers from the severe impairment of "rheumatoid arthritis," but failing to explicitly provide that she suffers from "rheumatoid arthritis *of the wrists*." (Doc. 14 at 5-6). Jackson asserts that this "generalized" and "non-specific" finding mandates remand because "[a] reviewing Court would not be able to trace the Decisions [sic] path of reasoning as [to] how this 'severe' impairment affects the ability to perform basic work activities." (Doc. 14 at 5). Jackson further notes that the wording of the ALJ's conclusion at Step Two "is important because this impacts the RFC at Step-Five." (*Id*.).

Jackson cites no case law in support of this argument, and indeed cites no case law whatsoever in her brief beyond that necessary to establish the standard of review. (Doc. 14 at 5-12). Jackson's assertion that a reviewing court would be misled by the ALJ's failure to specify which of Jackson's joints was impacted by arthritis is facially implausible. Reviewing courts, including this Court, have access to the ALJ's entire decision, not just his Step Two finding and RFC assessment. As Jackson herself notes, the ALJ "did note in the Decision" that

22

Jackson "was found to have Arthritis of both hands." (Doc. 14 at 6). The ALJ specifically discussed Jackson's "elevated rheumatoid factor," that she expressed "joint pain in various parts of her body, including . . . hands, [and] wrists," and that she has "mild degenerative changes" in her left and right hands. (Tr. 17). Presuming that a reviewing court will skim the ALJ's decision and be left with an inaccurate picture of the claimant's ailments is not a sufficient ground for remand. *See Garcia v. Comm'r of Soc. Sec.*, No. CIV.A. 11-13807, 2012 WL 3759102, at *1 (E.D. Mich. Aug. 6, 2012) (affirming the Commissioner's decision where the ALJ did not specify which joint was affected by rheumatoid arthritis in the Step Two finding); *Dodd v. Comm'r of Soc. Sec.*, No. 1:11-CV-217, 2012 WL 6963670, at *2 (W.D. Mich. Nov. 21, 2012) (same).

> 2. *The ALJ Did Not Err by Failing to List Carpal Tunnel as a Severe Impairment*

Jackson next argues that the ALJ erred by failing to list carpal tunnel syndrome as a severe impairment at Step Two despite Dr. Paris's and Dr. Weaver's diagnoses of that syndrome. (Doc. 14 at 6-7). Jackson's first carpal tunnel diagnosis derives from her May 6, 2011, visit to the Oakwood Healthcare Center-Canton. There, Dr. Weaver appears to have written in the "plan" portion of the form "DX carpal tunnel will treat [with] splint/meds," but also wrote "R/O carpal tunnel" in the clinical impression portion. (Tr. 562). Similarly, in the typed records from that visit, Dr. Weaver recorded "r/o carpal tunnel L wrist" in the diagnosis portion of the form, but in the instructions box recorded "Carpal Tunnel Syndrome," "splint," and "Ibuprofen tablets or capsules." (Tr. 568). These records seem to suggest that Dr. Weaver both diagnosed carpal tunnel syndrome and sought to rule out that diagnosis, perhaps through

further testing. Despite being far from a model of clarity, this record can be fairly understood as a tentative diagnosis of carpal tunnel syndrome. Jackson's second carpal tunnel diagnosis occurred on August 26, 2011, during a visit at the United Rehab & Medical Center, wherein Dr. Paris noted that Jackson "has carpal tunnel syndrome bilat." (Tr. 482).

Jackson's assertion of pain resulting from her diagnosed carpal tunnel syndrome is documented in numerous subjective complaints, which she lodged repeatedly during her treatment at United Rehab & Medical Center in 2011 and 2012. (*See, e.g.*, Tr. 417-44). However, a claimant must do more than demonstrate a diagnosed condition combined with a litany of subjective complaints: she must also show the disabling effects of that condition. *See* 20 C.F.R. § 404.1520(c) ("If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled); *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("[W]hen doctors' reports contain no information regarding physical limitations or the intensity, frequency, and duration of pain associated with a condition, this court has regularly found substantial evidence to support a finding of no severe impairment." (quotation omitted)); *Long v. Apfel*, 1 F. App'x 326, 331 (6th Cir. 2001) ("The mere diagnosis of an ailment, of course, says nothing about the severity of the condition." (quotation omitted)).

The question is then whether sufficient evidence, including objective medical evidence, supports Jackson's assertion that her carpal tunnel syndrome significantly limits her ability to do basic work activities; it does not. In support of her assertions regarding the severity of her carpal tunnel syndrome, Jackson points towards the findings of United Rehab & Medical

Center employee physician's assistant Cheryl Boyd. (Doc. 14 at 6-7). Boyd crafted an assessment of Jackson's ability to do physical work-related activities, and therein asserted that Jackson is unable to walk for more than five minutes, stand more than five minutes, sit more than five minutes, must elevate her legs at ninety degrees for three to four hours daily, and must rest for six to seven hours daily. (Tr. 397, 401). Boyd also asserted that Jackson can grasp, twist, and turn objects for only thirty minutes per day with either extremity, can perform fine manipulation for only five minutes daily with either hand, and can reach for only thirty minutes daily. (Tr. 401). Because physician's assistants are not an "acceptable medical source," Boyd may not provide evidence establishing the existence of an impairment or provide a medical opinion. 20 C.F.R. § 404.1513; *see also Woods v. Comm'r of Soc. Sec.*, No. 09-13037, 2010 WL 3070093, at *12 (E.D. Mich. July 13, 2010). She may, however, render statements regarding the severity of Jackson's impairments and how such impairments affect her ability to work. 20 C .F.R. §§ 404.1513(d). Given that Jackson's carpal tunnel syndrome was diagnosed by Dr. Paris and Dr. Weaver (Tr. 482, 562), Boyd may offer insight into the impact of these impairments.

However, as the ALJ recognized, Boyd's highly restrictive assessment of Jackson's limitations is wholly inconsistent with both the other medical evidence of record and with Jackson's own statements about her residual functional abilities. (Tr. 19-20). Jackson asserted that she dusts for an hour twice weekly, does laundry for four hours twice weekly, shops for food twice weekly for an hour, sometimes plays cards, and cooks three times daily, including three-course meals. (Tr. 195-97). Jackson asserted that she is sometimes afraid that she will fall, has some difficulty getting up and down, experiences some pain while standing, and

25

experiences persistent wrist, leg, and ankle pain, but did not assert that her maladies limited her ability to perform her activities of daily living to the extent that Boyd suggests. (Tr. 193-97). Boyd's restrictions would limit Jackson to a total of five minutes of standing per day, a limitation which is inconsistent with almost any of Jackson's asserted daily activities, including shopping, cooking, and taking two daily ten minute walks. Jackson's sister's function report also serves to undermine Boyd's assessment, as she reported that Jackson plays board and computer games, both of which would be difficult or impossible if Jackson's carpal tunnel syndrome was as severe as Boyd's analysis suggests. *See Bradford v. Astrue*, No. 2:10 CV 15 DDN, 2011 WL 147734, at *8 (E.D. Mo. Jan. 18, 2011) (finding that a claimant's playing of computer games detracted from his assertion of serious wrist pain resulting from carpal tunnel syndrome). Further, Boyd asserts that Jackson's pain and symptoms are severe enough to "constantly" interfere with her concentration and attention necessary to perform simple work tasks (Tr. 402), yet Jackson and her sister reported that she has no difficulties with attention or concentration in their respective function reports. (Tr. 186, 198). Boyd's questionnaire focuses heavily on Jackson's alleged severe lower back pain, and lists as other symptoms shortness of breath, chest pain, dizziness, palpitations, lumbar joint pain, stiff lower back muscles, and numbness and decrease of range of motion in the lower extremities. (Tr. 397).

With regard to the other medical evidence of record, Jackson's physical condition was found to be generally normal within months of her July 2012 visit with Boyd. In October 2012 Jackson was found to "move all extremities without difficulty," had a steady gait, and a normal range of motion. (Tr. 556). In December 2012 Dr. Weaver found that Jackson had a normal

range of motion. (Tr. 548). While Jackson complained of hand pain during a June 2012 doctor's appointment, radiological testing revealed no abnormalities in the first instance, and only "mild degenerative changes of the first, second, third, and fourth metacarpophalangeal joints," with "no evidence of erosions, fracture, or osteonecrosis," and no evidence of damage to the soft tissue, flexor tendons, extensor tendons, carpal tunnel, or Guyon's canal in the second instance. (Tr. 528). In describing Jackson's functional limitations, Boyd stated that Jackson was disabled due to "SEVERE low back pain and peripheral neuropathy," and by her chronic obstructive pulmonary disease. (*Id.*). This is notable in that Jackson's medical records reveal a few sporadic complaints of knee pain in 2003 (Tr. 281) and 2006 (Tr. 269), yet a 2012 x-ray of her knees showed no significant results. (Tr. 507). Jackson's complaints of lower back pain are yet more scant. (Tr. 279, 468-70). Similarly, Jackson does not mention back pain in her 2012 function report, but rather notes that the pain in her "wrist, legs[,] and ankles" limit her ability to work. (Tr. 193). Additionally, while Boyd asserted that Jackson could only use her hands to grasp, turn, and twist objects for thirty minutes per day, perform fine manipulation with her fingers for five minutes per day, and reach overhead for thirty minutes per day (Tr. 401), she does not appear to set forth any conditions or symptoms which would justify those restrictions. In short, irrespective of Boyd's status as a non-physician source, her residual functional capacity assessment is wholly inconsistent with Jackson's own reported activities and other medical evidence of record, and thus cannot provide the support which Jackson requires to demonstrate that her carpal tunnel syndrome is a severe impairment.

Jackson next points to a doctor's note drafted by an employee at United Rehab & Medical Center on June 5, 2012. (Doc. 14 at 7; Tr. 533). Ignoring the indecipherability of the

signature on that document, and assuming that the form was in fact created by Dr. Silber, it nevertheless provides only weak evidence in support of Jackson's alleged carpal tunnel syndrome. The form contains no explanation of why Jackson is unable to lift more than five pounds, stand more than five minutes or sit more than ten, and thus does not tie her state of disability to carpal tunnel syndrome. *See Cochran v. Comm'r of Soc. Sec.*, 198 F.3d 244 (6th Cir. 1999) (noting that even a treating physician's statements regarding disability must be supported by "underlying clinical data" to merit deference); *Toins v. Comm'r of Soc. Sec.*, No. 13-CV-14801, 2014 WL 6389582, at *11 (E.D. Mich. Nov. 14, 2014) (holding that an ALJ did not err in finding that a claimant's breathing condition did not prohibit sedentary work where the claimant failed to connect her alleged need to lie flat to her breathing condition). As with Ms. Boyd's assessment, this restrictive limitation does not seem congruent with Jackson's activities of daily living. To whatever extent "further evaluation" was necessary, Dr. Barbat's June 20, 2012, MRI scan which revealed no evidence of carpal tunnel syndrome serves to demonstrate that carpal tunnel was not the cause of Jackson's limitations. (Tr. 410-11).

Finally, even if the ALJ erred by failing to list carpal tunnel syndrome as a severe impairment, this error was harmless because he considered "the cumulative effect" of her severe and non-severe impairments in his decision. *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009); (Tr. 13). Thus, the ALJ did not err by failing to include carpal tunnel syndrome as a "severe impairment" at Step Two.

### 3. *The ALJ Did Not Err by Giving Little Weight to Cheryl Boyd's Findings*

As noted above, the ALJ gave little weight to the opinion of physician's assistant Cheryl Boyd. (Tr. 18-19). The ALJ did not err in this decision because Boyd's findings are not well

28

supported by other evidence of record, and assert limitations greater than even those asserted by Jackson herself.

###### 4.      *The ALJ Did Not Err by Rejecting Dr. Silber's Work Note*

Finally, Jackson argues that the ALJ erred by rejecting the aforementioned work note allegedly drafted by Dr. Silber. (Doc. 14 at 10-11). Jackson asserts that the ALJ should not have rejected the opinion because any uncertainty about the signature should have prompted the ALJ to contact either Jackson's attorney or the drafter of that opinion, and that the opinion is well supported by other evidence of record. (*Id.*). As an initial matter, the ALJ might have committed reversible error had he rejected the document solely because of uncertainty about its authorship. *See Toussaint v. Comm'r of Soc. Sec.*, No. 10-14827, 2012 WL 592198, at *7 (E.D. Mich. Feb. 1, 2012). However, where an ALJ rejects an opinion for reasons other than its uncertain provenance, no error is committed. *See Waters v. Comm'r of Soc. Sec.*, No. CIV.A. 10-14927, 2012 WL 511998, at *6 (E.D. Mich. Jan. 5, 2012). Here, the ALJ rejected the work note both because of the uncertain signature and because the "extreme exertional restrictions are not supported by objective or clinical evidence.[4]" (Tr. 19). As noted above, the extreme

---

[4] Jackson also asserts that the ALJ erred in his "disregard to Dr. Silber's opinion" by "fail[ing] to look beyond the x-ray report of [Jackson's] hands" (14 at 11), and that the Commissioner has attempted to bolster the ALJ's opinion "in a post-hoc fashion" by discussing evidence in the record which the ALJ did not actually reference (18 at 4). While Jackson is correct that the ALJ did not directly cite every portion of the transcript that the Commissioner mentions in her brief, the ALJ's notation that the "extreme exertional restrictions are not supported by objective or clinical evidence" is sufficient to justify his decision, particularly given his numerous references to Jackson's largely normal examinations and self-reported activities of daily living. (Tr. 18-19). Even assuming that the ALJ's stated justifications were deficient, the Court has noted substantial evidence demonstrating that Dr. Silber's work note is overly restrictive. Remand would thus be an "'idle and useless formality.'" *McIntosh ex rel. TLA v. Comm'r of Soc. Sec.*, No. 12-CV-10361, 2012 WL 6966654, at *11 (E.D. Mich. Nov. 6, 2012) (quoting *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766 n. 6 (1969)).

restrictions proposed in that note are not well supported by other evidence of record, including Jackson's reported activities of daily living and objective medical evidence.

Jackson also seems to suggest that Dr. Silber's limitations are well supported if one considers her combination of arthritis and carpal tunnel syndrome, including "x-rays, positive Rheumatoid factor on blood work, diagnosis of Rheumatoid Arthritis of the wrists, and Bilateral Carpal Tunnel." (Doc. 14 at 11). Indisputably, the available medical evidence provides good reason to believe that Jackson suffers from arthritis, and was at least at one point diagnosed with carpal tunnel syndrome. (*See*, *e.g.*, Tr. 479, 482, 496, 568). However, because these diagnoses are not well supported by evidence demonstrating the allegedly disabling effects of those conditions, Jackson is not considered to be disabled by those conditions. *See* 20 C.F.R. § 404.1520(c). Jackson argues that "[m]erely because a patient has 'mild' Arthritis does not equate to 'mild'" pain. (Doc. 14 at 11). This assertion is well taken, but it does not relieve Jackson of her duty to present objective evidence of the disabling effects of her alleged pain, and this she has not done. The ALJ's decision to discount Dr. Silber's work note is thus supported by substantial evidence.

### H.     Conclusion

In sum, the ALJ did not err by failing to specify at Step Two that Jackson suffered from "rheumatoid arthritis *of the wrists*," his decision to not include carpal tunnel syndrome as a severe impairment at Step Two was well supported by evidence of record, and his decision to not credit Physician's Assistant Boyd's questionnaire and Dr. Silber's work note was properly justified and explained in his decision. For these reasons, the Court **RECOMMENDS** that

Jackson's Motion for Summary Judgment (Doc. 14) be **DENIED**, the Commissioner's Motion (Doc. 17) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

31

Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: July 22, 2015                                    S/ PATRICIA T. MORRIS
                                                       Patricia T. Morris
                                                       United States Magistrate Judge

## <u>CERTIFICATION</u>

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 22, 2015                                    By s/Kristen Krawczyk
                                                       Case Manager to Magistrate Judge Morris